Good morning ladies and gentlemen. Our first case for this morning is Ciarpaglini against Norwood. Thank you, and may it please the court, Erica Ross on behalf of appellant Mr. Sharplini. I would like to focus this morning on the two questions on which this court specifically requested supplemental briefing. First, whether Mr. Sharplini's claims for declaratory and injunctive relief regarding the four prescription limitation are justiciable. And second, whether he has a cause of action to enforce section 1396 AA10. The answer to both of those questions is yes, and those answers require a remand. I'll begin with justiciability. It is undisputed that when Mr. Sharplini filed this lawsuit, defendants were applying the state's four prescription limitation to him, denying him the drugs that he claims he needs to survive. So can I just ask, they were applying it, I suppose, initially by refusing to approve the other three drugs that he needs, is that correct? Eventually they move him to the managed care program, which does give him all the drugs. That's correct, Your Honor. But at the time he files, he has sought and has failed to obtain permission to get the other three? That's correct, Your Honor. The complaint alleges, the second amended complaint, which is the operative complaint here, alleges that he was denied on multiple occasions pre-authorization for these additional drugs. And that really goes to sort of the heart of why we think that this case is not moot, because the same officials have already acted on the same requests that Mr. Sharplini will need to bring again in the future when he moves out of the county as he states that he intends to do. And so cases, both in the pre-enforcement context and in the voluntary cessation and capable of repetition contexts, make clear that Mr. Sharplini should not have to suffer the be denied his medications once again by these very same officials and then come into court. That, in this case, is particularly grave because it will cause him to risk his health and he alleges his life when and if he moves to another county that does not have a similar managed care program. Now suppose he stays in Winnebago County, is there anything in this complaint or in the record to suggest that the state might decide that even people in managed care programs can get only four drugs a month or decide to move him from managed care program back into whatever the alternative is, you know, a PPO or whatever they have? Absolutely, Your Honor. In the declaration, which of course the District Court and this court was able to consider because it includes jurisdictional allegations, Mr. Sharplini alleges that he had a conversation with Defendant Arndt who informed him that he could be moved back into the ambit of the four prescription policy if the state's fiscal condition did not improve, which obviously it seems like may be an issue moving forward. We're not quite there yet. We're not, but it seems as though it may be an issue and that he specifically asked, you know, is this permanent and she said no it's not. This could, you know, you could be subject to the four prescription limitation again and again she identified these two specific scenarios either if he moves out of the county or if the state's fiscal policy changes which would affect even if he stays in Winnebago County. Counsel, is there any issue as to whether the move to the managed care program was targeted at the plaintiff? Or was it simply countywide? You know, Your Honor, I'm not sure that the record really reveals whether everyone in the county has been moved to managed care. There's no issue though that he was individually targeted for this, was he? I'm not, I guess I'm not sure. I haven't seen any claim to that effect. No, I don't think he claims, for example, he has a retaliation claim. He doesn't claim that he was sort of placed in this program specifically to get rid of this lawsuit, though I'm not sure he has to make that allegation under a voluntary cessation analysis. Well, I've got to say I have some trouble on the justiciability front here because he's not subject to this now. There's no indication that the state is going to move. This is not the kind of move that a state makes lightly, such a major change in the way that it does Medicaid. And I guess I'm concerned about your pre-enforcement theory where we shift from mootness, in essence, to ripeness. Because the theory there, as I understand it, seems to be that anybody anywhere in the country could say, well, I would like to move to a place where I believe state officials are violating state federal law in their administration of a benefits program that I would like to benefit from when I move there. And I'm just not, that's a pretty remarkable expansion of justiciability, at least beyond the Susan B. Anthony List case. Well, Your Honor, I don't think that that's the necessary import of our argument. Mr. Sharplini isn't sort of anyone anywhere in the country. He is a Medicaid beneficiary. He has had this past experience. Okay. Anywhere, any Medicaid beneficiary or a beneficiary of any government program, your arguments aren't specific. Your justiciability arguments aren't specific to Medicaid. That's correct, Your Honor, but he has had this past history, which Susan B. Anthony List, of course, says is quite important with respect to the credible threat of future enforcement. He's had this past history in which these drugs have been denied to him, even though he has been prescribed these drugs by his doctors. And so he falls within a much narrower class of you know, he has exactly what Susan B. Anthony List sort of asks for, which is an intent to do something that he has specifically alleged. He says, I believe it's paragraph 8 on page A9 of the record, that but for this for drug limitation, he would move to Stevenson County. Could a resident of Indiana bring such a claim? Who wants to move to Stevenson County, Illinois? I think that that would be a more complicated question, Your Honor, given the interstate issues there. Why? Well, because in that case, you might run into some of the federal, the decisions about federal benefits that my friend on the other side has raised. But I think that here, we're really squarely within, you know, Mr. Sharplini's claim is that the state is distinguishing between these counties. If it wants to have managed care, that's perfectly fine. That is a way that they can run their system. But what they can't do is in other counties, deny individuals pre-authorization to... Then why can't individuals in those counties bring this claim? I mean, he seems to be like a peculiarly inappropriate plaintiff to challenge policies in counties where he is not resident and to which he is not subject. Well, I think the reason why, just saying that individuals in those counties that currently do not have managed care could bring this claim, the reason why that's not a really Mr. Sharplini was that plaintiff when he brought this lawsuit. He was in a county, he was subject to the four prescription limitation at that time, and then once he filed this lawsuit, the state decided to move him into managed care and to remove him from the four prescription limitation. But that was a countywide policy, right? I'm not sure whether it was or not. Does justiciability depend upon that? I don't believe that it does. I think that the question here is whether, once again, there's sort of an imminent risk of injury to Mr. Sharplini. And, you know, it's important to remember that Susan B. Anthony List sort of dials back that requirement. The Sixth Circuit had said that it essentially had to be about to happen. And the Supreme Court said, no, you need a credible threat of enforcement and the past history of enforcement against this particular plaintiff, who alleges that he would like to engage in specific conduct in the future, is sufficient. And that's exactly what Mr. Sharplini alleges here. So I have two questions about that. One, under Susan B. Anthony List or anything else, is his reason for wanting to move to Stevenson County of any relevance? And my other question is a broader one. I mean, it seems to me you really have three theories of justiciability. You've got your pre-enforcement challenge, which, as Judge Hamilton points out, is really almost a ripeness challenge vis-a-vis a potential move to Stevenson County. You have your voluntary cessation theory. And you also have your capable of repetition theory. And of those three, the one that I'm actually most interested in is the voluntary cessation theory, since I think it actually avoids some of the problems you've been discussing with Judge Hamilton. Although, the reason I ask the first question is, it seems to me if he's trying to move to Stevenson County, you know, because he has a relative there, he can live more cheaply, you know, there's something that makes it a very concrete thing. He hasn't just sort of thrown a dart at the wall and said, how about Stevenson County, Illinois? It might cause the the imminence of the move and the reality of the deprivation to take on more plausibility. Sure, Your Honor. So, I sort of agree with both of those those propositions. The first being that I believe that he has alleged that he would like to move because he has better job prospects in Stevenson County. And so, that would be his his motivation for moving. And that at the time that this for prescription limitation was being applied to him, he wanted to move. But then he, you know, he was removed from that limitation and he was told, well, if you go and you pursue those jobs in Stevenson County, you will lose access to the medications that you need to survive. And so, that obviously does make his injury, I think, quite imminent here. And then second, I completely agree and understand Your Honor's point with respect to voluntary cessation. We do think that's sort of the, you know, hitting the hammer or hitting the nail with the smallest hammer here. Voluntary cessation is a very straightforward doctrine in this case because defendants, once this lawsuit was filed, removed Mr. Sharpleney from the program, from the for prescription limitation. But they have not disclaimed that limitation. They have not stopped applying it. They, in fact, apply it to lots of other people within the state and they have made clear their intention to apply it to Mr. Sharpleney once again. And so, that's sort of a quintessential voluntary cessation case and defendants don't contest that they bear the burden in undervoluntary cessation analysis. And the Supreme Court has referred to it as a formidable burden of showing that it is absolutely clear that the for drug limit won't apply to Mr. Sharpleney in the future. So, let me ask you this. Going back to the question whether virtually everyone in Winnebago County was moved to one of the three managed care programs that the county apparently has or whether it's just Mr. Sharpleney, is that a question that goes to standing or does that go to the merits of the claim he's trying to bring? Well, Your Honor, I think that it goes probably more to the merits because there may be some question about on the merits whether the the program is working as it should and whether individuals are getting the drugs that they need throughout the state. But I do understand how it could go to the justiciability analysis if, for example, one thought that the voluntary cessation, you know, the ceasing of conduct by the state has to be narrowly targeted at the individual. But I don't think that that's actually true. I don't think the, I think the Supreme Court has made clear that we need to be more skeptical of any change that happens once a lawsuit is filed and it doesn't necessarily have to be with the sort of bad motive of taking this just that we need to sort of look at at these jurisdictional changes very closely. Well suppose the state had moved everybody to a managed care program but reserved the legal right to, if it didn't work out, didn't work out, say well we'll go back and maybe we'll reconsider our for drug limit again. Would that be enough? I think that that would be a closer question than what we have here because what we have here is a specific statement by a specific state officer saying this will apply to you again if you move and this will apply to you again if the state's fiscal policy changes, not maybe it might, maybe we'll reconsider. Let me just interrupt you and say, I mean, I didn't see anywhere that said essentially that in the managed care program you will forever be guaranteed all of the medications that you need. I thought that there was some claim that maybe even the managed care program will have a limit. That's correct, Your Honor. I don't mean to suggest that's not true. That's possible. That is possible, but I think just as a state could recede from any policy and we're talking here about pretty broad policy changes not directed at one particular lawsuit, right? I think that that's right, Your Honor, but again I think that the state is saying more than just maybe will we consider as we always consider, you know, as we always leave open the opportunity to reconsider all things. Well, that's why he's challenging the program as a whole. I mean, I think it is a statewide program and if it has a four prescription limit he's saying that doesn't comply with the Medicaid Act. That's correct, Your Honor. He's saying it doesn't comply with the Medicaid Act, that the way it's being carried out violates due process. He has a variety of challenges and his own specific prior experience with the policy really makes those concrete because he has had this experience of, you know, if this case goes back on remand as we believe that it should, Mr. Sharpleney is prepared to offer documents that say, you know, the reason that your medication was denied is your medication was denied. And so he has sort of these concrete experiences where the state's, you know, whatever it sort of says on the books, it really hasn't been applied across the board in a way that comports with either federal Medicaid law or due process or a variety of these other rights. Is he seeking to represent a class? He is not at this time, Your Honor. Could I ask a practical question? As far as this four and seven medications, since I get some prescription drugs myself, some are very cheap. Could he accept the fact that one may cost, as one recent for me was $3.50 for 90 days. That's pretty cheap, but it may be an essential drug. Can he pick out four, the most expensive ones, and not worry about the ones that are very cheap, and stay within that drug limit? Well, Your Honor, I do believe that he has some say in terms of which four are covered, but he specifically alleges that he can't afford all seven, or eight actually, in his case, I believe. And so I don't think he has this problem of, you know, the $3 drug or the $4 drug. He has clearly alleged in the complaint that he can't afford all seven. That's what I'm curious about, when they say you only get four. Whose choice are the four? I believe that he alleges that he has been asked to pick and choose, and while from a cost perspective that may actually be a good thing, from a medical necessity perspective that can be a very dangerous thing. That's one of the reasons for all of this, of course, is cost, and you're trying to put a cap on it, and not just have drugs for anything that's whimsical. So it's got to be serious. I just ask that as a practical matter. There may be some flexibility within the program that someone can say, yeah, there's four. I happen to have a law clerk whose son has cystic fibrosis, and that's real steep. But there's a program, she happens to be in Michigan, that has a certain amount of selection, and they will actually, the state will actually subsidize the ones that are very hard to get, rare, not enough people. So that's just a practical question, and maybe it's not relevant here, but it's a curiosity that I have this in the whole program. Yeah, my understanding again, just from Mr. Sharplini's allegations, is that he has been permitted some flexibility in terms of which drugs are covered, but that that has not allowed him to sort of pay for the whole bundle, because he can afford even those other prescriptions that are not being subsidized by the state. I see that I've worked myself into my rebuttal time. You may reserve the rest of it. Okay, thank you very much. Mr. Maggio. Good morning, Your Honor. Good morning. My name is Timothy Maggio. I'm an assistant attorney general, and this morning I represent the State Appellees. With the court's permission, may I take just 30 seconds or 90 seconds to just prohibit any Medicaid beneficiary from receiving a medically necessary drug? The statute is a funding statute, and it talks to the pharmacy, and it says to the pharmacy, in a 30-day period, right, so we're just talking about per month, per beneficiary, in that 30-day period, when the beneficiary comes in with the first four prescriptions, those are paid, no questions asked. The pharmacy gets paid. After that, somebody comes in and says, they went to their doctor, they said, I'm running out of my medication, I need a new prescription. The doctor then takes a look at his or her sheet, his or her record, sees, oh, this is the fifth prescription that I've given this person this month, right, then the doctor seeks prior approval. The doctor says, this is medically necessary, it's not duplicative, it will keep him or her out of an institution, seeks prior approval, and they get a response from that within 24 hours, or if it's a weekend when the apartment is closed, they're given a 72-hour emergency supply, so that no one is caught short, no one is out of luck, and we think, by the way, you know, there's an implication here that prior approval is some sort of a negative thing, right, but prior approval, there's nothing in the record about prior approval being negative. Somebody comes in and says, the doctor goes in and says, here's the fifth prescription, and it's for, excuse me, as I understand, part of the way you just described. That actually gets to the ex parte Young idea, that if the system were working so that 24 hours, or at the worst, 72 with an emergency supply was there, and that was the first thing I wondered about this case, you know, if you could get the rest of your drugs on prior approval, what was the problem? But then it was clear that his allegation, at least, is that it's not working that way. That, to me, is an issue that does not go to his standing to complain anything. It really goes to the question whether he'll be able to prevail eventually, and if it's working the way you say, then he's going to lose his case. But that's not a standing point. May I resist, push back on that a little bit, Your Honor, if I may? The allegation in his complaint, right, he doesn't allege in his complaint that he didn't receive, he doesn't identify one he's obviously still living at home, he's not institutionalized, he's getting his medications, and the allegation in his complaint, the reason why we're here, and I think someone mentioned it this morning, the flavor of this complaint is that when Mr. Ciarapiglini filed it, he filed it thinking that prior approval was across the board unlawful. Here is what he says. His complaint says, quote, the prior approval system is fraught with flaws and nothing less than laughable. We're here having this entire discussion because all he alleges, doesn't identify any drugs, he just says, I think prior approval is laughable. But he does concede, or the complaint as it's coming to us tells us that he's getting four drugs before he's moved over to the managed care program, now he's getting whatever, you know, seven drugs, eight drugs, I thought it was seven but maybe it's eight, he's getting all the drugs, presumably the managed care doctors are not frivolously prescribing the other four drugs, and his allegation as a pro se litigant, I would translate to say the prior approval system isn't working, that it's, that it's not, maybe on paper it looks great, but on the ground it's not great. So why isn't that a claim stated by somebody injured by the practice? Well I mean, I think in broad strokes it's the district court found because the prior approvals provision doesn't apply to him. Well now that he's been moved to the managed care for the time being it doesn't, but I'm focusing on the original system that existed at the time he filed the complaint, and the fact that by this might fall into the voluntary cessation idea that the state has temporarily decided to give him whatever medication he wants through this managed care program, but that it might decide again to change and go back to the, what you described, the first four no questions, but then drugs five through N you've got to jump through some extra hoops. Right, and I suppose the two responses to that your honor is, you know, if we notice in all of our discussions, it might, someday, there could be, who knows, who knows, and in terms of voluntary cessation. I don't think this is very flex, I mean I don't think it's, thinking of Susan B. Anthony List, I don't think there's anything hypothetical about it when we have a state official telling him, and when we know that if he were to move to a county where he can actually get a job and maybe be less of a burden on the ineffective prior approval program. Well let me talk about voluntary cessation and then Susan B. Anthony for me. Right, voluntary cessation, this case doesn't even fall within that fact pattern. Right, the notion behind voluntary cessation is that somebody files a lawsuit, the defendant then fixes the problem so that it goes away, and the hallmark of that is that the defendant is then free to return to his or her evil ways. Exactly. And as Judge Hamilton's talking about, that's not, that's entirely unrealistic in this situation. I'm not sure that's what Judge Hamilton said. He's probing some questions on the other side. Here's a situation where the state has rolled out managed care to a county. The notion that the state of Illinois identifies a variety of counties to roll out its managed care program. Does the record reflect that every single person in Winnebago County is now in a managed care, every Medicaid recipient is now in a managed care? The record does not contain that information, Your Honor. Isn't that important? I don't think it is, not from our perspective, no. If the question, Your Honor. What if they just put annoying people in managed care? Your Honor, if they put annoying people in managed care, I don't even know what annoying means. Oh, kind of like Mr. Ciciglini, who files lots of requests and who's, he's kind of a pest. I mean, I'm not saying that he is annoying. This presumably would violate a lot of other provisions of Medicaid. Hypothetically. Yeah, I don't think whether he was put in for standing, and there's nothing in this record that indicates that that happened. What we're asking, the question here is whether he has standing, and the analysis on all three levels is relatively straightforward. In terms of voluntary cessation, the notion that the state of Illinois would roll out managed care to Winnebago County in order to stop a lawsuit, and then as soon as the lawsuit went away, it would then take all of its managed care infrastructure out of the state and leave the state then without a managed care program and wait to see whether he goes to Stevenson County or LaSalle County or Kane County, and when he gets there, what will we do? We would then open up all of our managed care and roll it out to the new county. I agree, that sounds silly, but what I don't understand is why it would prevent the state of Illinois from saying, we don't really care what kind of program you're in. Managed care, non-managed care, we're going to have a prescription limitation for the no questions asked group of drugs. If the question is what would prevent them, the question is nothing would prevent them. Who knows what might happen, but that's the whole point to standing. That's the whole point of the district court's mootness analysis. The district court said I could take a look at all the twists and turns of 512 and managed care and Medicaid, but I don't need to. You're making me think maybe there is a good pre-enforcement challenge here, because if he really needs to move to a county that doesn't happen to be as populous as Winnebago County, that's one of the bigger counties in the state, aside from, you know, the Chicago and Collar counties, he can get a job, he can probably live more inexpensively in other areas, and yet the only way he can take advantage of that is to lose his medication, so he has to compromise his health in order to be in a position where I take it you agree he would have standing. If he moves first to Stevenson County and there is no managed care and he's back under the four prescription limit and the system isn't working for the pre-approval, then you would agree he has standing. I suspect people do. So he has to just compromise his health in order to be in a position where he has standing. Yeah, Your Honor, again, there there are several responses. First, embedded in your question is the assumption that prior approval is a negative thing. Second, I'm just saying it might be a great thing, but if it's not working, if it gets lost in the bureaucratic, you know, cyberspace, then even though it might be a great thing where somebody's taking a look at it, I actually have no feeling plus or minus it is what it is. But then if I may, let me just directly address this pre-enforcement issue that Your Honor raises, right? Susan B. Anthony is a sensible rule and it says three things. One, if you plan to engage in constitutionally protected conduct, two, there is a statute that penalizes you for doing that. Puts you in prison, fine, civil penalty, whatever it is. It doesn't, but that's a narrow list of penalties and I take it you don't think that his Medicaid benefits is enough. No, it's not, Your Honor, because if you take a look at Susan B. Anthony, Susan B. Anthony says nothing about preserving state property rights. Susan B. Anthony doesn't say anything about if you have a state created property right, then you have standing. That would be sort of, that's that would be a... It's a constitutionally recognized property right. No, no, no, but Susan B. Anthony says this, if you're going to engage in constitutionally protected activity and in his due process conduct, what's her, his procedural due process, where does this statute 512J say, if I file an appeal, if I ask for a hearing, if I file an application, if I engage in my constitutionally protected conduct of due process, I am penalized. It's not here. It's nonsensical, which is probably why it wasn't in this court's order to brief, frankly, right. So the whole notion that due process provides any support for Susan B. Anthony is just, it's not a fit at all with the statute. He then tries the interstate travel, but that fails as well for many of the reasons we've already talked about this morning. You don't get to, if there is a fundamental right to interstate travel and if it operates like the right to interstate travel, you don't get to say I live in Connecticut, I would like to live in Hawaii, but Hawaii doesn't give me the same bag of goodies or the same bag of benefits and so I have a claim. That's not what it is about. Of course, but the federal-state partnership, so every state has the prerogative and every state has indeed decided how much of a Medicaid program it wants to have and so I think that factors very significantly into the interstate movement. You can't force the state of Hawaii to have the same Medicaid program that Vermont has. It's under this federal statute itself, the partnership that Congress created. Hawaii can decide to have a generous one, a minimal one, whatever it wants. So once you're inside a state though, you're inside a state's plan and the state is administering it, so it's a little different. Your Honor, I would respectfully suggest it's not different at all because the Supreme Court has told us, let's leave benefits aside. The Supreme Court has said in terms of federal wage benefits, right, whether or not, and I forget the exact term, but if you live in New York you get a little bit more money than if you live in Des Moines or something like that in terms of your salary. The Supreme Court has said it does not state a violation of the interstate right to travel because you claim, well I live here, I believe the states were Connecticut and Hawaii. You don't get to say in Connecticut, when I live near New York, I get more federal wages, but when I move to Hawaii I get fewer federal wages. That's a completely different situation and by the way it doesn't apply to federal judges, but we get the same amount no matter which state we live in. It doesn't apply to our staff. Yeah, it's a similar situation. The reason I bring it up, Your Honor, is because Your Honor said that it happened in a different jurisdiction. Well if you take a look at differences... Well I'm saying each state, and we've been watching this roll out with the Affordable Care Act, some states have chosen to expand Medicaid, some states have said no we don't want to do that. It's very clear that is the right of each state to make that decision, but once you're inside the state there's a program and for the people who live in Rockford get this, the people who live in Rockford get that, and the people who live, you know, in Benton, Illinois get something completely different. That's, it's at least a different legal issue. Yeah, my only point, Your Honor, is the the federal wage hike, that's all just within the federal system. So when you're in within the federal system... That's right, so you lose the whole federal state partnership business and you lose the fact that the Medicaid statute governs what states are entitled to do. Mm-hmm. I mean, I think at the end of the day, Your Honor, the Supreme Court has said that when we're just talking about the federal government and what it does, not in terms of partnerships with anybody, so that's akin to what Illinois does with 512, that if somebody's in Connecticut and they say, I get more federal wages in Connecticut than if I move to Hawaii, and I sue because I want to move to Hawaii, and the fact that my employer, the federal government, doesn't give me as much money after I move to the place I was in, that's a violation. The Supreme Court has said no. Is that a merits problem or is that a standing problem? It's a standing problem, Your Honor, it's a standing problem, because what we're talking about here under Susan B. Anthony, we're talking about pre-enforcement again, right? This is the world we're in, pre-enforcement. And Susan B. Anthony says the plaintiff needs to know that I'm engaging in constitutionally protected conduct and the statute makes that unlawful. It provides a penalty for what I want to do Plus three, there's an imminent threat that I'm actually going to be penalized. But you know, I'm not sure, he wants all of his prescriptions. He can get them in managed care in Winnebago County. He can't get them in Stevenson County, because the state has not created a mechanism that's going to work. And I'm not sure that it matters too much which mechanism it is, but that's what he's focusing on. Yes, but Your Honor, he says he can't get them in Stevenson County. With respect, I don't know how he would possibly know that, right? And here's the difference. Because he has alleged, at least, for standing purposes, that the pre-approval process doesn't work. And he's experienced it already before he was moved to managed care. And so, on the merits, is he going to prove this? I don't know. I'm sure the state will come in with statistics showing how quickly it approves these kinds of requirements. He'll come in with other evidence. I'm sorry, Your Honor. But it's not a merits question. It's not entirely a merits question, right? It is a merits question in part. In part, but it is not exclusively a merits question. And here's the point. When he moves to Stevenson County, if he moves to Stevenson County, and this gets to one of the questions asked before, has he said why he wants to go? No. His affidavit does not say that he thinks he has better job prospects there. He doesn't tell us when he wants to go, if he wants to go. It doesn't say, in five months, I'm going to move there because I have a job with ABC Corporation. There's no allegation of that effect. He doesn't want to do that. I think he sees himself in a catch-22, because if he moves there and loses his extra drugs, he's going to have to suffer from a health point of view until the state sorts all of this out. We just don't know what happens. And if he moves— Arndt has told him that if he moves to Stevenson County, he's going to be back under the same—you get four prescriptions, but this ineffective pre-approval process is going to be applied for the others. Yeah, but he's going to have a different physician. He's going to have a different pharmacy. And if Your Honor recalls— But not a different state. If Your Honor recalls— It's the same state process. If Your Honor recalls for prior approval, you don't file for prior approval. You ask your doctor, and your doctor is the one who says, this is now the fifth prescription of the month. And he or she is the one that fills out for prior approval. So even if we accept Mr. Chirpiglien's allegation, the reason why we're here, the prior approval is laughable, whatever that means. We have no idea whether, when he goes, if he goes to Stevenson County, if he's still ill at the time, if he still needs more than four drugs, we have no idea whether his pharmacist or his physician at that time will experience the same laughable consequences or conditions that he says his Stevenson County— or Winnebago County—physician or Winnebago County pharmacist are experiencing. There are just so many ifs involved in this thing. This is exactly why the district court said, look, there's no reasonable expectation that this problem is going to arise again. So if we take a look at these three standing components, quite simply, there is no constitutionally protected activity that he wants to do that he is going to be penalized for. 512J is applicable in each and every county of the state. His complaint on prior approval is that there's a benefit he has in Stevenson County, pardon me, in Winnebago County that may not be available, and that simply doesn't state a claim based on interstate travel. And it wouldn't state a claim on interstate travel if it's done the same way. In terms of the more traditional notions, voluntary cessation or capable repetition, again, as we set forth in our brief, the fact patterns aren't here. Capable repetition, this isn't something like pregnancy where the dispute, by its essence, cannot survive the life of a lawsuit. You know, I think you're right about that. I don't see this as a capable of repetition since it's not the same kind of inevitably short period. And then again, just to put a ribbon on the voluntary cessation, the notion there that we would roll out to a complete county, and then as soon as Mr. Chair believes that, we'd roll it all back. Well, that's your sense of the voluntary cessation. And I told you, I think there's another way of looking at it that's not quite that dramatic. Is there a possibility that he moves to another county and gets a better job that actually has benefits and he'd be off of Medicaid? There's certainly, I suppose, if you... Well, I mean, you're talking about that. It's not Medicaid forever, necessarily, is it? No, the answer to your question is, is there a possibility? Yes. And that, at the end of the day, is what's the hallmark of this case and what's correct about the district court's decision. There's a possibility that a lot of things happen. He moves to another county, he gets a job, he has a medical program, the world's a happy place. We don't have to resolve any of these issues. He moves and he becomes eligible for a different program. We don't have to resolve any of these issues. What if? Is there a possibility? That's the hallmark of why we're here. But he can't move without a guarantee that, at least for the interim, his medical needs will be taken care of. Your Honor, I suppose the question is, are the federal courts out here to give people guarantees against all anxiety? I'm going to a new school... Why is it that way? But that's the question, right? No, it's not. The question is, what does the Medicaid program guarantee those who participate in it? I'm going to... I see my time is expiring. You may finish your last thought. I'd like to follow up on a couple of other matters. Just go ahead. All I was going to say is I'm going to a new school, I'm anxious. A new job, a new county, whatever. There's a lot of anxiety. All right, I understand this point. Maybe you should answer Judge Hamilton's question. Well, my concerns, Mr. Maggio, have to do really kind of with our record here. Because I tend to agree with what you're saying about county-by-county policy decisions, but we really don't have much about that in the record. Maybe we should take judicial notice of it. I don't know if we can. But I'm also curious about the allegations that popped up in the reply brief from the plaintiff, about after you made the point that in Winnebago County, three managed care providers are available. And Mr. Ciarpolini is saying, I didn't get a choice. I just want to understand, maybe this is just something that might need to be explored if the case goes back, but I assume that there would be some provision to comply with the federal waivers needed for these kinds of managed care programs, that if the beneficiary or participant fails to make a choice when given the opportunity, then the officials designate which managed care provider would cover. Is that what happens? I believe that's actually a stated provision of the law, that the Medicaid managed care beneficiary is given the choice. They get a letter that says you have these two choices or three choices. Please respond in a month. If there's no response, they get a second letter that says, again, you have these. Please respond. If you don't, we will pick one for you, but it's your choice, and you have these two chances to do that. But if you don't, you need to be in managed care. And so if you waive it, then we'll pick one for you, if that's Your Honor's question. What I'm guessing and what you're telling us is outside the record and might need to be explored, as I say, if it goes back. But I appreciate it. Might I respond to that for a second? Sure. This gets to whether there's a new claim being involved here, right? His claim on managed care in his complaint was a violation of 1396 AA23. I don't want to get too nerdy about it, but the allegation is that he has a choice to obtain assistance from any, that's the word in the statute, any person qualified to provide him with health care. He said that was his violation. And in his complaint, he alleged, and I think it's at 825 of the appendix. In his complaint, he alleged, that's exactly my problem. I want to see anybody I want, not a managed care person, because he says you can't make me. Could you help me with the timing? Because I thought when he filed his complaint originally, he wasn't in managed care yet. So why would he be complaining about some hypothetical future possibility that the state of Illinois was going to move him to managed care? Yeah, I don't know that it was in his original complaint. I believe it might have been in his amended complaint, Your Honor. I would have to take a peek. Yeah, no, we can look at it. If you want to, please. If I might just finish the thought, though. His allegation was that, yeah, that's it. I get to see anybody I want, and you can't make me do it because you can't force me to see a doctor, quote, I have, quote, never seen or even knew. So that's his complaint. Now it turns out, of course, the district court says, well, you're just simply wrong. Of course they can put you in managed care. And he says, oh, okay. When I said I get to see anybody and you can't force me to see anybody, somebody I never knew, what I meant to say is, no, I don't get to see anybody. And yes, you can force me to see somebody I didn't know. My complaint is now entirely different. You didn't give me two choices. Okay. So we would suggest that's an amendment. Thank you very much. Thank you, Your Honor. So I appreciate the time. Thank you. Ms. Ross, I'll give you a little bit of extra time for rebuttal if you need it. Thank you. I just want to hit on a couple of points that came up during Mr. Maggio's time. First, we talked a lot about what exactly is alleged in the complaint with respect to Mr. Sharpleney's past experience with V-4 prescription limitation. I would just refer the court quickly to a few paragraphs. In his declaration, paragraph two on page A-8, he says that on numerous occasions his medications were denied. Paragraphs 50 and 53 and paragraph 63 of the second amended complaint make similar allegations. And so I don't think that this is just the laughable allegation that Mr. Maggio was talking about. There are specific allegations in the second amended complaint and Mr. Sharpleney's declaration stating that he himself was denied medications under the preauthorization requirement. And I think that that really does speak to the likelihood that Mr. Sharpleney will face this issue again in the future because he has said that these same state officials, the same state agency that administers this program throughout the state, has already decided that his specific medications for his specific illness are not medically necessary or are not going to be preauthorized for some other reason that we don't know. And so he has come to court with clear allegations that that has happened to him before and the expectation should be, given that the same officials and Mr. Sharpleney's same drugs and same illnesses will be at issue in the future, that it very well may happen again. That, of course, also speaks to the voluntary cessation point because it is, once again, defendant's burden on that theory to show that it is absolutely clear that Mr. Sharpleney will not suffer the same injuries in the future. And the state simply can't show that here. Is it the state's burden to show it just can never possibly happen again? That is the language in the cases, Your Honor, that it's absolutely clear that this will not happen again. What this court said, I believe it's in the court. Is there a time horizon? I mean, let's be realistic. You know, look, states are – Medicaid is a big, complicated program, very expensive. States are tinkering with their policies all the time, constant dialogue with the federal government about waivers, experiments, et cetera. Nobody can give guarantees of indefinite length. Well, I think, Your Honor, I would draw a distinction between a guarantee of indefinite length and what we have here, which is a state official, as Judge Wood pointed out, specifically saying to a beneficiary, this will apply to you in the future if X, Y, or Z happens. Well, you're quoting from Friends of the Earth, right? Friends of the Earth, the Supreme Court says in 2000 that the defendant, the state, has to demonstrate, quote, it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. So there's a reasonably thrown in there, but also an absolutely clear thrown in there. That's correct, Your Honor. Now we know. Exactly. But I do think that here, if you ask is this reasonable, when he's had a specific conversation with a specific state officer who says, you know, if you move or if the state decides that we don't have enough money to keep doing this, even within your HMO program, you know, you could be – you will be subject to this limitation again. Well, and there's another factor as well, which is that the Supreme Court said in a 2012 case, Knox against service employees, that it will not assume that the defendant will refrain from the policy under attack if the defendant is still asserting that the policy is constitutional. So the defendant's position, whether the defendant has acquiesced and said we recognize this is wrong, apparently plays some weight in that you have argued is not the state's position here. Right, and I think the state would have to concede that that's not the state's position given that they are applying the four-prescription limitation in other counties to other individuals. They have not said, you know, we agree that this statute is no good. In particular, this court made the same point in the Wisconsin right-to-life case that we cite in our briefs, that the failure to fully disclaim a law, I believe is the language, is enough to show that the state is holding on to that possibility and that will defeat or that will show that a case is not moot under the voluntary cessation doctrine. I see that I'm sort of out of my time. No, you're not. You have a minute. I was going to give you a little bit more because we extended Mr. Maggio's time. Sure. If you have more to say. You don't have to. Thank you. Oh, no, I'm happy to respond to a couple of the other issues that came up while Mr. Maggio was at the lectern. The Susan B. Anthony List issue, I would note that the point of that case is really to determine whether there is a sufficiently imminent injury in fact. And so that case does talk in terms of whether certain conduct is penalized, but there are many other pre-enforcement challenges to Medicaid provisions. The Supreme Court heard one in the Pharma v. Walsh case. The D.C. Circuit recently heard one in the NVXL Peacock case that we cite in the briefs. So it's not as though Susan B. Anthony List, by sort of narrowly looking at the problem in front of it, which was a statute that had a prosecutorial component, did away with all of these other pre-enforcement challenges. And that makes good sense because here it's very clear that Mr. Sharplini will suffer, as Your Honor pointed out, grave consequences if he is forced to move first, lose access to his medications, and then litigate later and sort of refile. You know, we see how I believe this lawsuit was filed in June of 2013. It takes a long time to get before a court to have somebody say, yes, you should have been getting these medications all along. And requiring Mr. Sharplini to do that while his health suffers is sort of exactly what these cases are meant to ensure doesn't happen. If I could quickly just on the sort of is there or isn't there a constitutional violation here. Why don't you do that and then you can wrap up. Oh, sure. I would just note that the Susan B. Anthony List language is about arguable constitutional, a statute that arguably affects an individual's constitutional interests. And so whatever the sort of fine points on interstate travel are, that doesn't defeat standing at this point because he has an arguable interest in moving to another county. That interest, particularly because the interstate cases are different for the reasons Your Honor noted, is at least sufficient to satisfy the standing under Susan B. Anthony List or, again, under the voluntary cessation doctrine. So if the court has no further questions, we would ask that the case be remanded. Apparently not. Thank you very much. And we appreciate very much you and your firm undertaking this service for your client and for the court. Thank you.